# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

CASSIE DAVIS,               }
                                  }
      Plaintiff,           }
                                    }
v.                            }          **Case No.: 4:04-CV-0831-RDP**
                                    }
AARON RENTS, INC.,        }
                                    }
      Defendant.        }

## MEMORANDUM OPINION

## I.    INTRODUCTION

Pending before the court is Defendant Aaron Rents, Inc.'s ("ARI") Motion for Summary Judgment (Doc. #28) filed on April 1, 2005. Plaintiff Cassie Davis filed her opposition to summary judgment (Doc. #30) on April 15, 2005, and ARI filed its reply (Doc. #31) on May 3, 2005. As set forth below, the court concludes that because Plaintiff has adduced sufficient evidence from which a reasonable trier of fact could find in her favor on each of her claims, ARI's Motion for Summary Judgment is due to be denied.

## II.    STATEMENT OF FACTS[1]

### A.    Background

Plaintiff filed her Complaint against ARI on April 23, 2004. (Doc. #1). Plaintiff claims she was subjected to a hostile working environment because of her sex, and that she was constructively discharged in violation of Title VII of the Civil Rights of 1964, 42 U.S.C. § 2000e, *et seq.* AF No.

---

[1]These are the facts for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.'") (citation omitted).

1.[2]  Plaintiff also asserts claims based on certain state law theories:  invasion of privacy; assault; battery; and negligent[3] hiring, retention, and/or supervision.  AF No. 2.  More specifically, Plaintiff claims that she was sexually harassed by the General Manager of ARI's Pell City, Alabama retail store on two separate days.  AF No. 3.

### B.   Plaintiff's Hiring

Plaintiff was only in ARI's Pell City store on three consecutive days, all of which were during the month of June 2003.  AF No. 4.  On June 16, 2003, Plaintiff entered the store to shop with her parents.  AF No. 5.  While there, she asked the person helping them, Rodney Shaw ("Shaw"), if ARI was hiring.[4]  AF No. 8.  Shaw was the General Manager of the Pell City store.  AF No. 9.  Plaintiff received and completed a job application.  AF Nos. 5, 11, 12.  Shaw does not know where the application is that he received from Plaintiff.  AAF No. 3.  Shaw told her to arrive at the store early the next day, around 8:00 a.m., so that she could take a necessary test.  AF No. 13.  Plaintiff recalls that Shaw "looked [her] up and down" right in front of her parents and told her that she was

---

[2]The designation "AF" stands for admitted fact and indicates a fact upon offered by Defendant that Plaintiff has admitted in her written submissions on summary judgment, in her deposition testimony, or by virtue of any other evidence offered in support of her case.  Whenever Plaintiff has adequately disputed a fact offered by ARI, the court has accepted Plaintiff's version.  The court's numbering of admitted facts (*e.g.*, AF No. 1) corresponds to the numbering of ARI's Statement of Facts as set forth in Doc. #29 at Ex. B and responded to by Plaintiff in Doc. #30.  Similarly, the designation "AAF" stands for additional admitted fact and corresponds to Plaintiff's additional undisputed facts contained in Doc. #30 and responded to by ARI in Doc. #31.  Any other facts referenced by the parties that require further clarification are dealt with later in the court's opinion.

[3]Plaintiff also claims ARI's conduct was wanton.

[4]Shaw was born on September 16, 1961, which means that he was forty-one years old when he interacted with Plaintiff.  AAF No. 2.  Plaintiff was born on December 5, 1984, and was eighteen years old at that time.  AAF No.1.

hired.  AF No. 10.  Plaintiff reported for training on June 17, 2003, and on June 18, 2003.  AF No. 7.  On June 18, 2003, she went home early and never returned.  AF No. 7.

### C.     Plaintiff's First Day

As instructed to do by Shaw, Plaintiff reported for training at ARI's Pell City store on June 17, 2003.  AF No. 7.  Plaintiff's parents dropped her off at the store around 8:00 a.m.  AF No. 14.  Plaintiff does not recall filling out tax records for ARI.  AF No. 15.  Nor did Plaintiff submit a blood, urine or hair sample to ARI for a drug test.  AF No. 16.  Shaw arranged for Plaintiff to take a hiring test in the room next to his office.  AF No. 17.  There was a glass-paned window between the two offices.  AF No. 17.  While taking the required hiring test, Shaw waved at Plaintiff to get her attention, and winked at her or otherwise behaved suggestively towards her.  AAF No. 4.

According to Plaintiff, after she took the test, "everybody came in and [Shaw] pretty much showed me around the store, like showed me how – where each thing was and like as far as like this is where the TV's are, this is where the refrigerators are, this is where this is, and that kind of thing."  AF No. 20.  Shaw then arranged for her to watch an informational video about the company, which Plaintiff described as follows: "It pretty much told how Aaron's started and that kind of thing, and the type of people that they would like to work there, that kind of stuff."  AF No. 21.  The video contained no information on ARI's employment policies on harassment and was limited to information about ARI's operations.  AAF No. 6.

After she watched the video, Plaintiff stood at the counter with employee Jennifer Decker asking Decker how things worked in the store, such as the computer setup.  AF No. 23.  Plaintiff considered this conversation to be part of her training.  AF No. 23.  As she and Decker stood at the counter, Shaw walked behind them and brushed the open front of his hand first along her buttocks

and then along Decker's buttocks.  AF No. 24; AAF No. 9.  Plaintiff asked Decker "why [Shaw] did

that, had he always done that to her.  And [Decker told Plaintiff] oh, he's just playing around, don't

think anything about it."  AAF No. 10.  Plaintiff testified she told Decker, "I was like, but it's not

supposed to be like that, he's supposed to be our boss, you don't do things like that.  And she said,

oh, he's always like that, he always does stuff like that, he's just playing."  AAF No. 10.

Shortly after that incident, Shaw announced to the employees that he would go pick up

breakfast for them and told Plaintiff that she could accompany him to see what kind of errands she

might have to run.  AF No. 25.  Plaintiff accompanied Shaw to Jack's to pick up breakfast, but

admits nothing inappropriate happened during that errand.  AF No. 26.

After returning from Jack's, Plaintiff again left with Shaw to run errands at his request, which

included a stop by Shaw's house.  AF No. 27.  Shaw told Plaintiff he had to visit his house in order

to change clothes.  AF No. 28.  Shaw told her to come inside with him and Plaintiff told him that she

did not want to do so; however, she eventually went into his house and stood just inside the door.

AF No. 29.

Shaw told her that he had plenty of alcohol and that ARI employees came to his house

after-hours to get drunk.  AF No. 30.  Shaw asked her if she dated black men and told her that if she

did, she "wouldn't go back."  AF No. 31.  Shaw also told her she should come over and get drunk

with him sometime.  AF No. 32.  Shaw offered Plaintiff alcohol while they were in his apartment,

but she refused.  AF No 33.  Shaw told her, "Why don't you come sit down and just hang out for a

little while, it's okay.  I'm not going to hurt you."  AF No. 34.

On the ride back to the store Shaw slapped Plaintiff's leg one time.  AF No. 36.  Plaintiff

then moved closer to the door and away from Shaw.  AF No. 37.  Shaw invited Plaintiff to his house

after work to drink, but she refused his offer.  AF No. 38.  Shaw and Plaintiff returned to the store at lunchtime.  AF No. 39.

After returning to the store, Plaintiff asked Decker again if Shaw had always acted this way, and Decker responded, "oh, he's just playing, you just have to get used to him, he's just that type of person, he's always been like that towards me and he doesn't mean anything by it."  AAF No. 12. Plaintiff replied to Becker, "well, he's supposed to be my boss."  AAF No. 13.

Plaintiff had no appetite for lunch that day.  AAF No. 14.  Between lunchtime until she left for the day at 5:00, Shaw did not do anything to Plaintiff that she found inappropriate.  AF No. 41. However, Plaintiff did witness Shaw go up behind another female employee, put his pelvic area into her and grab her "butt."  AAF No. 18.  Plaintiff's parents picked her up at 5:00 p.m. on June 17, 2003.  AF No. 40.  That night, Plaintiff told her father that she did not "feel comfortable with the place completely."  AF No. 42.

**D.    Plaintiff's Second Day**

Plaintiff decided to return to ARI on June 18, 2003, and her parents took her to the store around 9:30 a.m. AF No. 43.  During her second day, Shaw touched Plaintiff when she was standing by the sales office, grazing her buttocks with his hand as he walked behind her.  AF No. 45.  Shaw also patted Plaintiff on the back and then dropped his hand down slowly all the way across her "butt."  AF No. 46.

Later in the day, Plaintiff, Sales Manager Destiny Bell, and Shaw went for a drive in the delivery truck; Shaw drove, Bell sat in the middle, and Plaintiff sat by the passenger door.  AF No. 49.  In general, Bell remembers Shaw constantly looking up and down Plaintiff's body.  AAF No. 8. Bell also accused Shaw of making inappropriate comments and gestures, including the "once you

go black, you never go back" and "dry humping" a window at her.  AAF No. 52; AAF No. 55; AAF No. 58.

During their drive, Shaw stated that he needed to stop at K-Mart to purchase supplies for the store.  AF No. 50.  When they arrived at K-Mart, Shaw told Plaintiff that she would have to meet with ARI's Regional Manager, Kealen Ogletree.  AAF No. 19.  Shaw also told Plaintiff that she did not need to wear pants, and that instead she should wear a skirt.  AAF No. 20.  When Plaintiff inquired as to why, Shaw answered her by stating "you've just go to show a little bit of leg so it looks good to my manager."  AF No. 53; AAF No. 21.  Shaw selected the skirt, brought it over to Plaintiff, held it up to her and commented that it would "fit right."  AF No. 54.[5]

Shaw purchased pens and office supplies along with the skirt.  AF No. 55.  Shaw, Bell, and Plaintiff returned to the Pell City store in the delivery truck, sitting in the same arrangement.  AF No. 56.  When they returned to the store after lunch, Shaw asked Plaintiff to try on the skirt.  AF No. 57.  Plaintiff told Shaw that she did not want to do so because it was not part of her job.  AAF No. 25.  Shaw told her it would look better if she wore a skirt to her interview with the Regional Manager and that it was not going to hurt to "show a little leg."  AF No. 58; AAF No. 26.

Plaintiff eventually put on the skirt and, after doing so, Shaw suggested that she roll it up because it was longer than he thought it would be; however, Plaintiff refused to do that.  AF No. 60.  Plaintiff was wearing white underwear which could be seen through the material of the skirt, and Shaw told her he liked it that way because he was able to see her "butt" and she had a nice "butt."

_____

[5]Shaw admits that he bought Plaintiff a dress or a skirt along with other supplies at the K-Mart.  AAF No. 23.  Upon learning about Shaw's purchase of ladies clothing, Ogletree remarked, "That's kind of bizarre, yes."  AAF No. 24.

AAF No. 28.  Shaw further remarked to her that her "butt" looked better in the skirt than it did in the pants she had been wearing.  AF No. 61.

Shaw informed Plaintiff that she needed to meet Ogletree at the Green Springs store in Birmingham.  AF No. 62.  Plaintiff was uncomfortable riding to the Green Springs store with someone she did not know, but Shaw told her that she had to go and found her a ride there because she had no transportation of her own.[6]  AF No. 64; AAF No. 30.  After arriving at the Green Springs store, Ogletree and Plaintiff introduced themselves to one another.  AF No. 66.

After arriving at ARI's Green Springs store, a female employee told Plaintiff to wait in a chair outside Ogletree's office, and, while she was sitting there, she overheard Ogletree speaking to Shaw on the telephone.  AF No. 67.  Plaintiff heard Ogletree tell Shaw that he had done a good job because everyone in Pell City would have something good to look at while they worked and that Plaintiff was "fine."  AF No. 68.  Plaintiff's also heard Ogletree ask Shaw how old she was and if she had a boyfriend.  AF No. 69.

After finishing his telephone conversation with Shaw, Ogletree invited Plaintiff into his office but had little to say to her.  AF No. 71.  Ogletree "just pretty much gave me like looks and stuff that made me feel like that big (demonstrating), the way he would look at me."  AF No. 72.  Ogletree asked her where she was from, if she had a boyfriend and how old she was.  AF No. 73. On her departure, Ogletree told her that he looked forward to her working for ARI and that he thought she would do just fine.  AF No. 76.

---

[6]According to Plaintiff, nothing inappropriate happened on the ride to or from the Green Springs store.  AF No. 65.

Upon returning from her meeting with Ogletree, Plaintiff traveled to the Oxford store, with Bell driving, Chandler sitting in the passenger seat beside Bell, Shaw sitting in the back seat behind Bell, and her sitting in the back seat behind Chandler (and next to Shaw). AF No. 80. Shaw explained that the reason for the trip was that there was a chance that Plaintiff might be transferred to that store. AAF No. 33. Prior to entering the car, Plaintiff told Bell that she did not want to sit beside Shaw. AF No. 81. More specifically, Plaintiff told Bell that she felt uncomfortable with what Shaw had said to her and with how he had touched her. AAF No. 35. Plaintiff also told Bell that Shaw's conduct towards her made her feel like less of a person because he treated her like a piece of meat. AAF No. 36. Nevertheless, Plaintiff ended up in the back seat with him anyway. AF No. 81.

During the drive from Pell City to Oxford, Shaw told her that she had "suckable" toes, and asked if she dated black men or if she would ever date a black person. AF No. 82; AAF No. 37. Plaintiff told Shaw that he should not ask her such things because he was her boss. AF No. 83. She also told Shaw that he was making her feel horrible. AF No. 83. Undaunted, Shaw grabbed Plaintiff on her leg beside her crotch. AF No. 84. Shaw also laid his head on her chest and Plaintiff pushed him away and told him to get off her. AF No. 85. After she pushed Shaw, he put his arm around her and Plaintiff pushed him off again. AF No. 86.

When they got out of the car in Oxford, Shaw tried to put his arm around her, but she again shoved him away. AF No. 87. On the return trip to Pell City, the seating arrangement was the same, even though Plaintiff attempted to separate herself from Shaw and expressly told him that she was not sitting in the back with him this time. AF No. 89; AAF No. 39. In response, however, Shaw instructed Chandler to sit in the front seat of the car again. AF No. 90.

On the return drive, Shaw tried to grab the inside of her left leg with his right hand, but Plaintiff moved her leg, pushed him away, and moved closer to the door on her side.  AF No. 91. Plaintiff reminded Shaw again that he was her boss and told him to stop.  AF No. 92.  Shaw responded, "all right, I see how you're going to be, like that, like real – like hateful.  I see how you're going to be.  Then he – like he sat over and slumped over in his chair like this right here (demonstrating).  And that was it.  He didn't say anything inappropriate and he didn't do anything after that."  AF No. 93.  Plaintiff testified she was under the impression, based upon Shaw's persistent behavior, that if she did not do what he wanted her to do, he would fire her.  AAF No. 42.

After they returned to the Pell City store around 5:00 p.m., Shaw told Plaintiff, Bell, and Decker that he was going to see if he could arrange for them to join the "Dream Team," which was described as some kind of Aaron's models who wear provocative Hooter's-like clothing.  AF No. 94.  Plaintiff attributes other unprofessional comments to Shaw such as: Shaw telling Plaintiff that she was pretty; Shaw saying that she had a nice "butt;" Shaw commenting that she had a nice body; Shaw asking Plaintiff about whether she had a boyfriend; and Shaw telling other male employees that he had found someone good looking for them to look at while they worked.  AAF No. 44.[7]

### E.   Plaintiff Never Returns to ARI

Plaintiff was "so upset and frustrated and mad" that she called her father and left work early. AF No. 95; AAF No. 47.  Plaintiff cried in the car on the way home.  AAF No. 49.  After sharing with her father the details of her ordeal, he advised her that "the best way to handle it is to, you know, go talk to an attorney and that's what I did."  AF No. 96.  Plaintiff never returned to ARI's

---

[7]While ARI indicates that it disputes in part Plaintiff's additional fact number 44, the appropriate additional fact number that corresponds with the evidence cited is actually 45. (Doc. #31 at I at 2).

9

Pell City store after departing early on her second day of work.  AF No. 97.  Plaintiff did not complain to ARI upper management about Shaw's behavior; nor did she file a police report regarding Shaw's conduct.  AF No. 98; AF No. 99.  However, Plaintiff asserts that Shaw never communicated with her about ARI's sexual harassment policies or reporting procedures.  AAF No. 51.  Moreover, Plaintiff has testified that she was never told by any other ARI employee about whom to report concerns about sexual harassment and never saw any posting concerning the reporting of sexual harassment.  AAF No. 51.  Plaintiff filed an EEOC charge in July 2003.  AF No. 102.

### F.    Affidavit of Former ARI Employee Stacey Hankins

In 2002, prior to Plaintiff's employment, Shaw traveled to the Drury Inn in Atlanta for an ARI business meeting.  While there, according to then ARI employee Stacey Hankins ("Hankins"), Shaw grabbed the hand of the desk clerk, rubbed his middle finger in the center of her palm, and would not let go of it as he talked to her.  AAF No. 62.  Shaw remembers staying at the Drury Inn and admits to possibly flirting with the desk clerk.  AAF No. 63.  The desk clerk was offended by Shaw's conduct and had to physically jerk her hand away from him.  AAF No. 64.

Also, on that same trip during the car ride to Atlanta, Shaw inappropriately touched Hankin's leg. AAF No. 65.  At dinner with Brock Roberts, an ARI manager, and while also with another ARI manager named "Tom," Hankins called Shaw a "pig" because of the way he treated the hotel clerk, and explained to them what he had done.  AAF No. 66.  Hankins also shared with them how Shaw had over-stepped his bounds when he inappropriately touched her leg while they were traveling in the car.  AAF No. 67.  Tom responded that Shaw was overly aggressive with women and that he had had to talk with him a few times.  AAF No. 68.

The following morning, the Drury Inn hotel clerk asked Hankins for the corporate number of ARI.  AAF No. 69.  The clerk also requested Hankins to provide her with Shaw's name.  AAF No. 70.  Hankins gave the hotel clerk Shaw's name and ARI's corporate number.  AAF No. 70.  Hankins witnessed the clerk called ARI and report Shaw's misconduct.  AAF No. 71.  No one from ARI ever discussed the clerk's complaint with Shaw.  AAF No. 72.

### III.    STANDARD ON SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *See id.* at 323.  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If the

evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; *i.e.*, facts that would entitle it to a directed verdict if not controverted at trial.  *See Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. The first such method is that the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.  The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This calls for more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; the movant must simply point out to the district court that there is an absence of evidence to support the non-moving party's case.  *See*

12

*Fitzpatrick*, 2 F.3d at 1115-16.  If the movant meets this initial burden, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant may no longer rest on mere allegations, but must set forth evidence of specific facts. *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

IV.   **ANALYSIS**

A.   **Federal Claims**

1.   **Hostile Working Environment**

Plaintiff asserts that she was harassed because of her sex by ARI's General Manager Shaw. Title VII provides that an employer shall not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1) (1994).  Title VII has been interpreted to specifically allow claims for harassment to rest upon the theory of a hostile work environment.  *See, e.g., Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).

A plaintiff attempting to show that she has been subjected to a hostile work environment must prove certain elements to establish the claim.  These elements include proof that: (1) the employee belongs to a protected group; (2) the employee was subjected to unwelcome harassment; (3) the harassment complained of was based upon sex; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive

13

working environment; and (5) there exists a basis for holding the employer liable.  *See Henson v. City of Dundee*, 682 F.2d 897, 903-04 (11th Cir. 1982); *see also Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 508 (11th Cir. 2000); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999).  The critical inquiry here, however, is whether Plaintiff has put forth sufficient evidence to establish the fourth element enumerated above.  The court concludes that she has.

The requirements to establish the severe or pervasive element are well known.  In order for a plaintiff to establish a *prima facie* case of hostile work environment harassment actionable under Title VII, the incidents of harassment must be "so 'severe or pervasive' as to 'alter the conditions of employment and create an abusive working environment.'"  *Faragher*, 524 U.S. at 786 (citing *Meritor Savs. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)); *see also Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1521 (11th Cir. 1995).  Title VII is not "a general civility code" nor does it protect against "the ordinary tribulations of the workplace, such as the sporadic use of 'abusive language, gender-related jokes, and occasional teasing.'"  *Faragher*, 524 U.S. at 788.  Infrequent or "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'" sufficient to constitute a violation of Title VII.  *Id.*

The severity of the behavior must be evaluated both objectively and subjectively in light of all the circumstances,[8] *see Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998), and, particularly in the event of an isolated incident, only the most extreme harassing conduct will be found to violate Title VII.  *See Faragher*, 524 U.S. at 788; *Oncale*, 523 U.S. at 81-82; *Meritor*, 477 U.S. at 67 ("[N]ot all workplace conduct that may be described as 'harassment' [is actionable].").

─────────────

[8]"The objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'"  *Mendoza*, 195 F.3d at 1246.

Moreover, evaluating severity or pervasiveness involves an inquiry into the gravity of the harassing conduct and is not merely a matter of counting the number of incidents. *See Vance v. Southern Bell Tel. & Tel. Co.*, 863 F.2d 1503, 1510-11 (11th Cir. 1989) (citing *Davis v. Monsanto Chem. Co.*, 858 F.2d 345 (6th Cir.1988));[9] *see also Carrero v. New York City Hous. Auth.*, 890 F.2d 569, 578 (2d Cir. 1989) ("The offensiveness of the individual actions complained of is also a factor to be considered in determining whether such actions are pervasive.").

As the Eleventh Circuit has stated:

> The Supreme Court and this court have identified the following four factors that should be considered in determining whether harassment objectively altered an employee's terms or conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997) (citing *Harris*, 510 U.S. at 23, 114 S. Ct. 367). The courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the Plaintiff's employment and create a hostile or abusive working environment. *Id.; see Harris*, 510 U.S. at 23, 114 S. Ct. 367; *Henson*, 682 F.2d at 904; *Faragher*, 118 S. Ct. at 2283 (citing *Harris*, 510 U.S. at 23, 114 S. Ct. 367, and explaining that "[w]e directed courts to determine whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances'").

*See Mendoza*, 195 F.3d at 1246. Against this legal backdrop, the court finds Plaintiff has adduced sufficient evidence regarding her hostile work environment claim to withstand summary judgment.

---

[9]The *Vance* decision was later abrogated, on other grounds, by the United States Supreme Court in *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993).

Plaintiff's subjective feelings about how she perceived Shaw's behavior as harassing are not in dispute.  In addressing the subjective component of severe and pervasive, the Eleventh Circuit has explained:

> We have said that sexual harassment is subjectively severe and pervasive if the complaining employee perceived it to be at the time.  Hulsey's deposition testimony indicates that she did. She testified that the harassment caused her emotional distress. Her words and conduct in response to Garrison's persistent advances are consistent with that. Every time Garrison made verbal or physical advances, Hulsey refused him.  She told him to leave her alone, she pushed him, she elbowed him, and she even kneed him in the groin in order to escape.

*Husley v. Pride Rests., LLC*, 367 F.3d 1238, 1248-49 (11th Cir. 2004) (internal citation omitted). The words that Plaintiff used to describe how Shaw's conduct made her feel include: upset, frustrated, mad, "freaked-out," and scared.  (Doc. #29 at Ex. 3 at 93, 159-160, 176-77).  Moreover, similar to her counterpart in *Husley*, Plaintiff refused Shaw's advances repeatedly, both verbally and physically.  Plaintiff has, therefore, satisfied the subjective aspect of her hostile work environment claim.

Turning to the objective factors, the court notes the conduct alleged by Plaintiff was far from infrequent. In sum, Plaintiff points to roughly eleven categories of harassing behavior and approximately nineteen harassing incidents over the course of two days, twelve of which involved inappropriate body contact.  Moreover, Shaw's conduct was severe, physically threatening, and emotionally humiliating.  Reviewing the evidence in the light most favorable to Plaintiff, Shaw's behavior included:  (i) telling her if she dated black men she would not go back to white men; (ii) trying to get her to drink with him at his apartment, promising her that she would not be harmed, and assuring her that other employees drink with him in his apartment; (iii) caressing her buttocks on more than five different occasions; (iv) grabbing/slapping her leg on three separate occasions; (v)

16

putting (or attempting to put) his arm around her at least three times; (vi) while in a car with her, leaning over her, resting his head on her chest, and grabbing her inner thigh beside her crotch; (vii) picking out a shear skirt from K-Mart for her to wear in order to show a "little bit of leg" to his immediate supervisor, Regional Manager Ogletree; (viii) commenting that he could see her nice "butt"in the shear skirt and that it looked better in the skirt than in the pants that she had been wearing; (ix) telling her that she had "suckable toes" and a nice body; (x) telling other male employees that he had found someone good looking for them to look at while they worked; and (xi) showing her and two other female employees pictures of girls on ARI's "Dream Team," who were dressed provocatively in Hooter's-like outfits and telling them that he was going to get them on the team.  Furthermore, there is sufficient evidence to permit a jury to find that the conduct interfered with Plaintiff's ability to perform her job.  For example, she received little or no new employee training, became upset, and has testified she pleaded with Shaw to stop the conduct because he was her boss.  However, despite Plaintiff's rebuking  Shaw for making sexually-charged comments and touching her inappropriately, his offensive behavior continued.

As explained by the Eleventh Circuit in *Booker T. Washington*, "[t]his set of facts differs from cases like *Mendoza* and *Gupta v. Florida Bd. of Regents*, where there were fewer instances of less objectionable conduct over longer periods of time."  234 F.3d at 509 (citations omitted).  Instead, "[t]he facts of this case are more akin to [a] 'continuous barrage of sexual harassment[.]'" *Id.* (citing *Dees v. Johnson Controls World Servs., Inc.*, 168 F.3d 417, 418 (11th Cir. 1999)).  Moreover, the court is not persuaded by ARI's argument that Plaintiff's failure to return to  ARI, report the harassment, and stay long enough for ARI to take corrective measures means that she

17

cannot establish severity or pervasiveness.  As the Eleventh Circuit responded to a similar argument in the *Hulsey* case regarding Hulsey's subjective feelings about the alleged harassment:

> Pride argues that if Hulsey had truly perceived the harassment to be severe and pervasive, she would have followed the company's internal procedures for reporting sexual harassment, or would have told someone (other than the co-workers who witnessed her protestations) about the conduct before she left. That argument is one Pride may make, but it should be made to the jury at trial. In the circumstances of this case, Hulsey's failure to report the sexual harassment before she was fired does not remove from the jury the issue of whether she perceived it to be sufficiently severe and pervasive and entitle Pride to judgment as a matter of law.

*Husley*, 367 F.3d at 1249 (footnote omitted).  This same reasoning is applicable here – Plaintiff's failure to return to work and to report Shaw's harassment to ARI upper management – are facts for the jury to consider under a  totality of the circumstances.  Therefore, for summary judgment purposes, Plaintiff has satisfied the severe or pervasive prong of her Title VII sexual harassment claim, and ARI is not entitled to summary judgment.

## 2.    Constructive Discharge[10]

"When an employee involuntarily resigns in order to escape intolerable and illegal employment requirement to which he or she is subjected because of race, color, religion, sex, or national origin, the employer has committed a constructive discharge in violation of Title VII." *Morgan v. Ford*, 6 F.3d 750, 755 (11th Cir. 1993) (internal quotations omitted).  "To successfully claim constructive discharge, a plaintiff must demonstrate that working conditions were 'so intolerable that a reasonable person in [her] position would have been compelled to resign.'"  *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001); *Morgan v. Ford*, 6 F.3d at 755-56.

---

[10]The court will revisit the viability of Plaintiff's constructive discharge claim upon a properly supported Rule 50 motion after the close of evidence at trial.

18

Plaintiff's understanding of the environment at ARI, based in part upon her eye-witnessing of Shaw's similar pattern of disrespectful conduct towards other female employees and their acceptance of this treatment, was if she did not allow Shaw to do with her what he wanted, then he would fire her. According to Plaintiff, she never received any policy statement concerning sexual harassment, nor did she get a corporate telephone number to contact for help. Her only interaction with upper management was when she met Regional Manager Ogletree, who, indirectly and directly, echoed Shaw's degrading comment about Plaintiff's being something good to look at and further inquired about whether Plaintiff had a boyfriend. A jury could conclude, based upon Plaintiff's contact with Ogletree, that she had a reasonable impression that he could not be counted on as a reliable person to act appropriately on a report concerning Shaw's behavior. Therefore, under a totality of the circumstances assessment, the court finds that Plaintiff has presented sufficient evidence to raise a genuine issue of material fact as to whether ARI constructively discharged her.

**B.      State Law Claims**[11]

Due to the existence of genuine issues of material fact, ARI's Motion for Summary Judgment with respect to Plaintiff's state law claims is similarly due to be denied. For example, as it relates to ARI's vicarious liability for Shaw's tortious conduct, a reasonable jury could conclude based upon

---

[11]The court acknowledges that the parties' citing and analysis of Alabama law as it relates to Plaintiff's state law claims could be much more better developed. For example, neither party has brought to the court's attention any Alabama cases on the issues of line and scope of employment and knowledge of an employer, when the alleged harasser, like Shaw, is the undisputed immediate supervisor of the complaining party and therefore, at least arguably, is also the employer. The decision in *Potts*, cited by both sides is not particularly helpful because it involves harassment by a co-employee and further it is expressly limited "to the question of whether BE & K took 'adequate' steps to remedy the situation after it learned of the conduct." 604 So. 2d at 401. Accordingly, similar to Plaintiff's constructive discharge claim, the court will revisit the viability of the state law counts, if so requested, at the Rule 50 stage.

the evidence surrounding Regional Manager Ogletree's conversation with Shaw about Plaintiff and the intrusive comments that Ogletree made to her directly, that Shaw's supervisor not only tolerates, but actually encourages demeaning treatment of women.   As a result, Plaintiff has demonstrated genuine issues of material fact exist regarding, among other things, whether ARI had knowledge of, participated in, authorized, or ratified Shaw's wrongful acts.   *See Potts v. BE&K Construction Co.*, 604 So. 2d 398, 400 (Ala. 1992) (describing standard under which employer may be liable for intentional torts of its agent).   As the Alabama Supreme Count held in *Potts*, an employer may be held liable for the intentional acts of its agent upon proof that:

> "[1] the agent's wrongful acts were in the line and scope of his employment; or [2] that the acts were in furtherance of the business of [the employer]; or [3] that [the employer] participated in, authorized, or ratified the wrongful acts."

604 So. 2d at 400 (quoting *Joyner v. AAA Cooper Transp.*, 477 So.2d 364, 365 (Ala.1985)).

The court is also persuaded that Plaintiff has presented sufficient evidence from which a reasonable jury could find ARI independently liable for its negligent supervision, and retention of Shaw.   For example, Plaintiff has offered evidence from which a reasonable fact finder could conclude that ARI had prior knowledge that (i) Shaw acted inappropriately toward women; (ii) Shaw was reported to have acted in a sexually offensive manner toward a desk clerk when he was visiting the Drury Inn in Atlanta in 2002; (iii) Shaw improperly touched an ARI female employee on the leg during this same trip to Atlanta; and (iv) ARI never conducted an investigation, provided counseling, or otherwise followed up on the two reported incidents in Atlanta.[12]

---

[12]Curiously, in the face of evidence that ARI managers had been told in 2002 of Shaw's conduct by its then employee Hankins and an Atlanta, Georgia hotel clerk (who both said they were the targets of Shaw's offensive conduct), ARI argues that "Plaintiff cannot present substantial evidence that [it] was wanton in its supervision or retention of Shaw . . . ."  (ARI's Memorandum of Law (Doc. #29) at 16).   It is for the jury to determine whether ARI ignored two different

## V.    CONCLUSION

As set forth above, the court determines that material factual disputes exist such that ARI is not entitled to judgment as a matter of law.  Accordingly, ARI's Motion for Summary Judgment is due to be denied.

**DONE** and **ORDERED** this _____5th_____ day of December, 2005.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

---

complaints about Shaw in 2002 and, if it did, whether it did so "with knowledge of danger, or with consciousness, that the doing or not doing some act [would] likely result in [the type of] injury [alleged here]. *Rommell v. Auto Racing Club of America, Inc.*, 964 F.2d 1090, 1096-97 (11th Cir. 1992) (quoting *Yahama Motor Co., Ltd. v. Thornton*, 579 So. 2d 619, 623 (Ala. 1991).  The court's ruling is buttressed by the Alabama Supreme Court's decision in *Machen v. Childersburg Bancorporation, Inc.*, 761 So. 2d 981 (Ala. 1999).  In *Machen*, the court held a plaintiff had presented substantial evidence to support her claims that the bank defendants negligently or wantonly failed to investigate, train, supervise, and discipline her harassing supervisor.  *Machen*, 761 So. 2d at 986 (Ala. 1999).  The court in *Machen* denied summary judgment and held as follows:

> After reviewing the evidence in a light most favorable to Machen, we conclude that the evidence creates a genuine issue of material fact as to whether the bank defendants took adequate steps to investigate Machen's complaint of sexual harassment and to train bank employees, including [the alleged harasser], regarding the bank's policies prohibiting sexual harassment, and whether they took appropriate disciplinary measures to remedy the situation; and, if they did not, whether their failure was the result of negligence or wantonness.

*Id.* at 987.  The court further noted "[a] jury could further conclude that had the bank defendants monitored and/or supervised the situation more carefully, [the alleged harasser] would not have repeated the acts of misconduct."  *Id.*  In *Machen*, the Alabama Supreme Court also found as follows:

> [T]he plaintiff had presented substantial evidence to sustain a claim challenging wanton investigation, training, supervision and discipline.  To prove wantonness, it is not essential to prove that the defendant entertained a specific design or intent to injure the plaintiff.  Wantonness is defined by statute as conduct which is carried on with a reckless or conscious disregard of the rights or safety of others. . . [T]his court described wantonness as the conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result.

*Machen, supra* at 987 (internal quotations and citation omitted).